# IN THE SUPREME COURT, STATE OF WYOMING

# 2024 WY 126

**OCTOBER TERM, A.D. 2024**

**November 26, 2024**

JOSEPH WILLIAM RUSSELL,

Appellant
(Defendant),

v.                                                                      S-24-0086

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Uinta County*
*The Honorable James C. Kaste, Judge*

*Representing Appellant:*
Office of the State Public Defender: Brandon Booth, Wyoming State Public Defender;* Kirk A. Morgan, Chief Appellate Counsel; Jeremy Meerkreebs, Assistant Appellate Counsel. Argument by Mr. Meerkreebs.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; John J. Woykovsky, Senior Assistant Attorney General. Argument by Mr. Woykovsky.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

* An order substituting Brandon Booth for Ryan Roden was entered on October 10, 2024.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]   Joseph W. Russell entered a conditional guilty plea to possession of methamphetamine in violation of Wyo. Stat. Ann. § 35-7-1031(c)(i)(C).  He reserved his right to appeal the constitutionality of a warrantless search that was executed as he entered the Uinta County Courthouse resulting in the discovery of the methamphetamine.  We affirm.

## *ISSUE*

[¶2]   Did the district court err when it denied Mr. Russell's motion to suppress evidence?

## *FACTS*

[¶3]   On November 14, 2022, Mr. Russell arrived at the Uinta County Courthouse to appear for a circuit court civil hearing.  Uinta County Sheriff's Deputy Dan Jensen was providing courthouse security that day.  Mr. Russell walked through the magnetometer, which alerted him to metal in Mr. Russell's waist area.  Deputy Jensen conducted a pat-down and found a snus can in Mr. Russell's pants pocket.  Deputy Jensen either asked or directed Mr. Russell to open the snus can revealing its contents—approximately .9 grams of methamphetamine.  Mr. Russell was charged with felony possession of a controlled substance as a third, or subsequent, offense, in violation of Wyo. Stat. Ann. §§ 35-7-1031(c)(i)(C), 35-7-1016(a) & (d)(ii), and 7-13-1616 (LexisNexis 2021).

[¶4]   Mr. Russell moved to suppress the contents of the snus can arguing the search violated his rights under the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution.  The district court held a hearing on the motion and heard testimony from Deputy Jensen and Mr. Russell.

[¶5]   Deputy Jensen testified that when people appear for court, he "run[s] them through the [magnetometer] and screen[s] for weapons . . . for safety and security."  He also explained that if the magnetometer alerts, further search will be conducted.  While he did not recall whether he communicated his usual methods to Mr. Russell, Deputy Jensen testified that as a regular practice, he would "indicate [to people] that [they] probably shouldn't have cell phones or weapons" with them, and that "there are lockboxes [where] they can . . . lock their stuff up."

[¶6]   Deputy Jensen testified that as Mr. Russell went through the magnetometer, it alerted to a metallic item "in his waistband area."  He then patted Mr. Russell down and felt something in his left pant pocket.  Deputy Jensen asked Mr. Russell what it was, and he responded that it was a "snus can."  He testified that after Mr. Russell took the can out of his pocket, he asked Mr. Russell if he could see what was inside.  Mr. Russell offered slightly different testimony.  He claimed that Deputy Jensen "reached into my pocket,

1

pulled the snus can out, and tried to open it" and when Deputy Jensen was unable to open the can, he ordered Mr. Russell to "[o]pen it."

[¶7]    Deputy Jensen testified that after the can had been opened, it "looked like . . . [Mr. Russell] was trying to hide something from me. . . . And it turned out to be a small plastic bag with a white crystal substance." Deputy Jensen testified that he suspected the substance was methamphetamine. He seized it and arrested Mr. Russell.

[¶8]    Deputy Jensen said he would be concerned about the contents of a metal container like the snus can entering the courtroom because such a container could potentially carry a weapon including a razor blade or an explosive. On cross-examination, Deputy Jensen conceded that before Mr. Russell went through the magnetometer there had been "nothing . . . suspicious" about his behavior. He admitted he did not recall whether he or Mr. Russell removed the can from Mr. Russell's pocket, and that he did not tell Mr. Russell he could put the can in a lockbox. Deputy Jensen also admitted that he did not have a suspicion that the snus can contained a gun or a bomb, explaining "I wanted to see the contents of it. Ask me why I wanted to. I don't know."

[¶9]    The district court denied Mr. Russell's motion to suppress. Mr. Russell entered a conditional guilty plea allowing him to appeal the suppression order. The district court sentenced Mr. Russell to one to three years of imprisonment, suspended in favor of two years of supervised probation. Mr. Russell timely appealed the denial of his motion to suppress.

## STANDARD OF REVIEW

[¶10]  The question of whether a search and seizure violated a constitutional right is a question of law subject to de novo review. *Ramirez v. State*, 2023 WY 70, ¶ 12, 532 P.3d 230, 233–34 (Wyo. 2023) (quoting *Levenson v. State*, 2022 WY 51, ¶ 16, 508 P.3d 229, 235 (Wyo. 2022)). "We defer to the district court's findings of fact unless they are clearly erroneous." *Chace v. State*, 2024 WY 20, ¶ 9, 542 P.3d 1078, 1081 (Wyo. 2024) (citing *Ramirez*, ¶ 12, 532 P.3d at 233–34). "We view the evidence in the light most favorable to the district court's determination because that court conducted the hearing and had the opportunity to assess the witnesses' credibility, weigh the evidence, and make the necessary inferences, deductions, and conclusions." *Id.* (citing *Ramirez*, ¶ 12, 532 P.3d at 233–34). "On those issues where the district court has not made specific findings of fact, this Court will uphold the general ruling" of the district court if it is "supported by any reasonable view of the evidence." *Workman v. State*, 2019 WY 128, ¶ 12, 454 P.3d 162, 166 (Wyo. 2019) (quoting *Brown v. State*, 2019 WY 42, ¶ 10, 439 P.3d 726, 730 (Wyo. 2019)).

## *DISCUSSION*

### *Did the district court err when it denied Mr. Russell's motion to suppress evidence?*

[¶11]  Mr. Russell claims the search of the snus can violated the Fourth Amendment of the United States Constitution because it was unsupported by an individualized suspicion of wrongdoing and was conducted without a warrant.[1]  The State counters that Deputy Jensen's conduct was constitutionally reasonable and, therefore, within the permissible scope of a warrantless search.

[¶12]  The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV; *see also* Wyo. Const. art. 1, § 4.  Searches conducted without warrants are presumptively unreasonable.  *Groh v. Ramirez*, 540 U.S. 551, 572, 124 S.Ct. 1284, 1298, 157 L.Ed.2d 1068 (2004); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2003); *Owens v. State*, 2012 WY 14, ¶ 10, 269 P.3d 1093, 1096 (Wyo. 2012).  This presumption, however, is not absolute.  The Supreme Court has explained, "When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or

---

[1] Mr. Russell challenges the district court's denial of his motion to suppress under the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution; however, he did not adequately raise or develop the Wyoming constitutional argument below or before this court.  *See Ramirez*, ¶¶ 15–16, 532 P.3d at 234–35 ("[T]o invoke an independent Wyoming constitutional analysis, 'the appellant must use a precise and analytically sound approach and provide [the Court] with proper arguments and briefs to ensure the future growth of this important area of law.'" (quoting *Morgan v. State*, 2004 WY 95, ¶ 20, 95 P.3d 802, 808 (Wyo. 2004))); *see also Sheesley v. State*, 2019 WY 32, ¶ 15, 437 P.3d 830, 836 (Wyo. 2019) (discussing six "'non-exclusive neutral criteria' [*Saldana* factors] relevant to determining whether the Wyoming Constitution extends broader rights to Wyoming citizens than the United States Constitution. . . . '(1) the textual language; (2) the differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern'" (quoting *Saldana v. State*, 846 P.2d 604, 622 (Wyo. 1993) (Golden, J., concurring))).

      Mr. Russell offers no analysis in support of his claim that the Wyoming Constitution independently protects him from the search at issue.  Where he raises his rights under the Wyoming Constitution, his arguments parallel his federal constitution arguments.  (*See, e.g.*, "Special needs searches are therefore only supportable by carefully tailoring their scope to the specific governmental purposes served by relaxation of the warrant requirement.  Only when so limited can they be found to be reasonable searches in the meaning of the Fourth Amendment and Article 1, § 4.").  Mr. Russell refers to "Wyoming's heightened standards for consent searches" without citation to authority.  Mr. Russell provides no analysis of the *Saldana* factors.  To the extent Mr. Russell addresses the test we adopted in *Hageman v. Goshen Cnty. Sch. Dist. No. 1*, 2011 WY 91, ¶ 19, 256 P.3d 487, 495 (Wyo. 2011), for evaluating the constitutionality of special needs searches, *see infra* ¶ 14, he does so in the context of his federal analysis, and does not cite to *Hageman*, but to three federal cases, *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); *MacWade v. Kelly*, 460 F.3d 260, 269 (2d. Cir. 2006); *Klarfeld v. United States*, 944 F.2d 583, 586 (9th Cir. 1991).  Mr. Russell has not provided "well founded legal reasons" justifying resort to independent state grounds to determine the constitutionality of the search of his snus can, and we do not conduct an independent Wyoming constitutional analysis.  *See Sheesley*, ¶ 15, 437 P.3d at 836.

individual, circumstances may render a warrantless search or seizure reasonable." *Owens*, ¶ 10, 269 P.3d at 1096 (quoting *Illinois v. McArthur*, 531 U.S. 326, 330, 121 S.Ct. 946, 949, 148 L.Ed.2d 838 (2001)). Addressing the administrative search or special needs exception to the warrant requirement, the Supreme Court has said, "[s]earch regimes where no warrant is ever required may be reasonable where 'special needs . . . make the warrant and probable-cause requirement impracticable,' and where the 'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control.'" *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 420, 135 S.Ct. 2443, 2452, 192 L.Ed.2d 435 (2015) (first quoting *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989), and then quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 44, 121 S.Ct. 447, 455, 148 L.Ed.2d 333 (2000)). The administrative search or special needs exception is perhaps more accurately described as a set of exceptions. *Verdun v. City of San Diego*, 51 F.4th 1033, 1038 (9th Cir. 2022), *cert. denied*, 144 S.Ct. 73, 217 L.Ed.2d 11 (2023). Despite the different designations, some courts treat the administrative search and special needs exceptions interchangeably, *see, e.g.*, *Verdun*, 51 F.4th at 1038 ("[t]here is a 'special needs' exception to the warrant requirement for administrative searches" (citation omitted)). Other courts identify them as two distinct exceptions. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 736, 131 S.Ct. 2074, 2080–81, 179 L.Ed.2d 1149 (2011) ("[t]wo 'limited exception[s]' . . . are our special needs and administrative search cases" (citation omitted)). For the purposes of this case, we find no meaningful difference between administrative and special needs searches and do not distinguish between them.

[¶13] Courts have specifically addressed security screenings, finding that they fall within the special needs or administrative search exception to the Fourth Amendment warrant and probable cause requirements. *See, e.g.*, *Klarfeld v. United States*, 944 F.2d 583, 586 (9th Cir. 1991) (taking judicial notice of threats of violence directed at courthouses and concluding that courthouse searches fall within the administrative search exception to the warrant requirement); *McMorris v. Alioto*, 567 F.2d 897, 899 (9th Cir. 1978) ("limited searches of persons seeking to enter sensitive facilities [fall within] an exception to the general requirement of the fourth amendment that searches are proper only if conducted pursuant to a lawful warrant" (citations omitted)); *Day v. State*, 829 S.E.2d 418, 419 (Ga. Ct. App. 2019) ("limited searches at sensitive facilities fall under the category of administrative searches, or the special needs exception to the Fourth Amendment's warrant and probable cause requirements" (citation and quotation marks omitted)); *State v. Griffith*, 455 P.3d 152, 159 (Wash. Ct. App. 2019) ("particularized exceptions are sometimes warranted where a search or seizure is directed toward special needs, beyond the normal need for law enforcement" (citation and quotation marks omitted)); *Commonwealth v. Gillespie*, 103 A.3d 115, 118 (Pa. Super Ct. 2014) ("where regimes of suspicionless searches or seizures are designed to serve governmental special needs that exceed the normal demands of law enforcement, they will be upheld in certain instances" (citation and quotation marks omitted)); *People v. Troudt*, 5 P.3d 349, 351 (Colo. Ct. App. 1999) ("one of the recognized exceptions to the warrant requirement is a regulatory search pursuant to a statutory or administrative program").

4

[¶14]  To determine the constitutionality of special needs searches, courts must determine the reasonableness of the search by balancing public and private interests.  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653–61, 115 S.Ct. 2386, 2390–95, 132 L.Ed.2d 564 (1995); *Hageman v. Goshen Cnty. Sch. Dist. No. 1*, 2011 WY 91, ¶ 19, 256 P.3d 487, 495 (Wyo. 2011).  The U.S. Supreme Court in *Vernonia* adopted a three-part test to determine the reasonableness of special needs searches.  This test requires courts to weigh: (1) the nature and immediacy of the governmental concern at issue, and the efficacy of the search for meeting it; (2) the nature of the privacy interest upon which the search at issue intrudes; and (3) the character of the intrusion.  *Vernonia*, 515 U.S. at 654, 658, 660, 115 S.Ct. at 2391, 2393, 2394; *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006); *see also Hageman*, ¶ 18, 256 P.3d at 495 (considering the constitutionality of a school policy that required random drug testing for students participating in extracurricular activities and adopting the three-part reasonableness test set forth in *Vernonia*).  This test applies to courthouse and other security screenings.  *See, e.g.*, *United States v. Hartwell*, 436 F.3d 174, 178–79 (3d Cir. 2006) (airport screening); *Gillespie*, 103 A.3d at 119 (courthouse screening); *Troudt*, 5 P.3d at 351 (courthouse screening).

[¶15]  To determine whether the search in this case was reasonable, we weigh the three factors.

## A.  Nature and Immediacy of Governmental Concern and the Efficacy of the Search for Meeting That Need

[¶16]  This factor has two components—the nature and immediacy of the government's concern and the efficacy of the search in addressing that concern—and we address each.

### 1.  Nature and Immediacy of Governmental Concern

[¶17]  "It is well settled that government has a compelling interest in protecting the public and its employees inside government buildings."  *Day*, 829 S.E.2d at 420 (probation/community supervision facility (citing *United States v. Lamson*, 993 F.2d 1540 (4th Cir. 1993) (federal courthouse); *Klarfeld*, 944 F.2d at 586 (federal courthouse); *McMorris*, 567 F.2d at 900 (state courthouse))).  Courthouse security checkpoints, like the one in this case, protect the public who might have business at the court, along with court employees, from the very real threat of violence directed at courthouses.  *See, e.g.*, *Gibson v. State*, 921 S.W.2d 747, 760 (Tex. App. 1996), *writ denied* (Nov. 15, 1996) ("Regarding the risk of violence in federal courthouses, the U.S. Marshals and Court Security officers have detected 350,000 weapons (knives or guns) since 1987 [and] during that same period of time there have been over 2000 threats to the judiciary." (quoting *Woods v. Thieret*, 5 F.3d 244, 246 n.2 (7th Cir. 1993))).  Courthouse screenings serve to prevent individuals

from bringing weapons and other dangerous materials, such as explosives, into courthouses. *See, e.g.*, *State v. Plante*, 594 A.2d 165, 167 (N.H. 1991) ("[t]he purpose of an administrative courthouse search is to deter individuals from bringing dangerous weapons into courthouses"). As the Utah Court of Appeals explained, "Courts present a greater security risk than many other governmental institutions, in part because they often [contain] a relatively large concentration of people known or suspected to have violent propensities, and because disputes, including disputes involving people prone to violence, are the courts' stock in trade." *State v. Cornwall*, 810 P.2d 484, 487 (Utah Ct. App. 1991); *see also* 5 Wayne R. LaFave, *Search and Seizure* § 10.7, at 384 (6th ed. 2020) (noting "as a result of bombings and other violence occurring in courthouses and similar buildings, inspection programs have also been established at such facilities"). Mr. Russell concedes that courthouse security is a manifestly important governmental interest in Wyoming and in courts throughout the country. *See* Appellant Br. 15 (conceding that the protection of "those with business before a state court, of the court's staff, and of the bench is . . . significant and important").

### 2. Efficacy of Magnetometer and Follow-up Searches in Addressing Governmental Concern

[¶18] The use of magnetometers with follow-up searches is a common and effective method to address potential security threats to the public and court staff because it prevents individuals from bringing weapons or other dangerous items into courthouses. *See Gillespie*, 103 A.3d at 119; *Commonwealth v. Roland R.*, 860 N.E.2d 659, 661 (Mass. 2007) (individuals entering the courthouse had to place items in basket to be scanned by an x-ray device and walk through a magnetometer), *abrogated on other grounds by Commonwealth v. Privette*, 204 N.E.3d 967 (Mass. 2023); *Troudt*, 5 P.3d at 350 (before entering the courthouse all members of the general public were required to pass through a security checkpoint that included use of an x-ray machine to examine contents of parcels and a magnetometer that the public must walk through); *Plante*, 594 A.2d at 165 (requiring people wishing to enter the secured area of the courthouse where the courtroom was located to submit to a search by magnetometer); *Klarfeld*, 944 F.2d at 585 (before entering courthouse, public had to pass through a magnetometer and pass items through an x-ray machine).

[¶19] Follow-up searches conducted after an x-ray or magnetometer has alerted, including pat-downs and examination of the contents of items, are also common and effective measures taken at courthouses or other security checkpoints. Courts have held that follow-up searches including pat-downs and opening or looking inside possessions are reasonable. *See, e.g.*, *United States v. Herzbrun*, 723 F.2d 773, 776 (11th Cir. 1984) (upholding follow-up search after bag passed through the x-ray machine reasonable); *United States v. Clay*, 638 F.2d 889, 891 (5th Cir. 1981) (upholding search of contents of manilla envelope contained in suitcase after suitcase passed through the airport x-ray screening device and showed a "dark" spot); *United States v. DeAngelo*, 584 F.2d 46, 48 (4th Cir. 1978) (search

extending to articles defendant attempted to conceal from airport screening x-ray was reasonable); *United States v. Epperson*, 454 F.2d 769, 770, 772 (4th Cir.1972) (upholding frisk where person activated metal detector, was subsequently asked to remove metal objects from clothing or person and pass through a second time, and then activated detector a second time before officer frisked his jacket); *McMorris*, 567 F.2d at 901 n.3 (upholding routine courthouse search procedure consisting of metal detector and subsequent pat-down); *United States v. Dalpiaz*, 494 F.2d 374, 375 (6th Cir.1974) (upholding pat-down search after defendant had activated metal detector); *Gillespie*, 103 A.3d at 120 (upholding search of item placed in plastic bin when defendant proceeded through magnetometer); *Troudt*, 5 P.3d at 351 (upholding search of cigarette case placed in basket after defendant was directed to place contents of her pockets into basket before passing through magnetometer); *Plante*, 594 A.2d at 167 (upholding search of metal Sucrets container in defendant's handbag as she passed through magnetometer before entering courtroom).

[¶20] The Uinta County Courthouse search procedure at issue here consisted of magnetometer screening which alerted to metal when Mr. Russell passed through it and a follow-up search of the area that alerted—Mr. Russell's pocket and snus can. Deputy Jensen testified that each person arriving at the courthouse is required to walk through the magnetometer before entering the courtroom. If the magnetometer alerts, a follow-up search is conducted. The magnetometer screening, pat-down, and opening of the snus can were applied to prevent potentially dangerous items from entering the courtroom. The search procedure was an effective procedure that addressed the legitimate governmental interest in court security. This factor weighs in favor of a finding that the search was reasonable.

## B.     Nature of the Privacy Interest

[¶21]  The privacy interest at stake during a courthouse search is minimal. A person does not have a "reasonable expectation of absolute privacy" in a "public facility where all members of the public [are] subject to a routine search." *Gillespie*, 103 A.3d at 120. "[B]y presenting oneself at a sensitive facility's security checkpoint, one implicitly consents to the screening and search of one's belongings." *Day*, 829 S.E.2d at 420 (citing *Herzbrun*, 723 F.2d at 776 ("those presenting themselves at a security checkpoint thereby consent automatically to a search, and may not revoke that consent if the authorities elect to conduct a search"); *McSweeney v. State*, 358 S.E.2d 465, 467 (Ga. Ct. App. 1987) (passenger who presents himself to an airport security checkpoint has consented to the screening of his luggage and his person)).  Accordingly, "when a person with notice of such impending search seeks entry into such a restricted area, he or she relinquishes any reasonable expectation of privacy and impliedly consents to the search." *People v. Rincon*, 581 N.Y.S.2d 293, 295 (App. Div. 1992).

[¶22]  Mr. Russell concedes that the detection of metal objects by magnetometer "does not implicate a significant privacy interest."  However, he contends that he had a legitimate

7

expectation of privacy in the contents of the metal snus can. We disagree. On seeking entry to the Uinta County Courthouse through the magnetometer, Mr. Russell relinquished any reasonable expectation of privacy in the snus can and its contents. *See Minich v. Cnty. of Jefferson*, 919 A.2d 356, 359–60 (Pa. Commw. 2007) ("People who enter courthouses do not have a reasonable expectation of absolute privacy because society has a duty to protect members of the public who are required to appear in court . . . ."); *People v. Price*, 431 N.E.2d 267, 270 (N.Y. 1981) ("It is common knowledge that all airline passengers and their luggage are subject to being searched and that these searches . . . are reasonable even when contraband is discovered in areas where a person would normally have a reasonable expectation of privacy.").

[¶23]  Mr. Russell cites *Morris v. State*, 908 P.2d 931, 935–36 (Wyo. 1995), in support of his argument. *Morris* is inapt to the circumstances here. In *Morris*, we held that the warrantless search of the defendant's wallet was unconstitutional. *Morris*, 908 P.2d at 935. There, deputies found the defendant sleeping in the backyard of a private home, woke him, and, because he was disoriented and unsteady, escorted him to the sheriff's office in their patrol car so that he could contact someone for a ride. *Id.* at 933. The defendant gave one of the deputies a phone number to call, *id.* at 937, and when the deputy got an answering machine, the defendant reached for his wallet to give him another number and realized his wallet was missing. *Id.* at 933. The deputy offered to look for the wallet in his patrol car. He found the wallet, opened it, and searched it for identification, revealing a folded piece of paper containing methamphetamine. *Id.* at 933–34. We held that under the totality of the circumstances, there were no specific and articulable facts to justify the search pursuant to an officer's community caretaker function and that the warrantless search of the defendant's wallet was, therefore, unconstitutional. *Id.* at 937.

[¶24]  Mr. Russell argues that the snus can, like the wallet in *Morris*, was a "'repository for personal, private effects' and thus was inevitably associated with an expectation of privacy." *Id.* at 935. Mr. Russell testified that he had been to the Uinta County Courthouse before, expected that he would be searched, and voluntarily entered the magnetometer. He knew that the deputies used the magnetometer to screen for knives and other weapons.

[¶25] Unlike the defendant in Morris, Mr. Russell consented to the search and relinquished any expectation of privacy in the snus can when he entered the courthouse, a restricted area where all members of the public are subject to search. *Supra* ¶¶ 5, 13 (citing cases). *See Rincon*, 581 N.Y.S.2d at 295. This factor weighs in favor of a finding that the search was reasonable.

8

## C.    Character of the Intrusion

[¶26]   The intrusion in a courthouse search is limited and commonly consists of individuals walking through a magnetometer and a search of handbags and other parcels. *Plante*, 594 A.2d at 167.   Other courts have characterized the nature of the intrusion of courthouse screenings as "routine and only minimally intrusive," *Rincon*, 581 N.Y.S.2d at 295, or "an absolutely minimal invasion of privacy," *Gibson*, 921 S.W.2d at 758.    Using a magnetometer is "a relatively inoffensive method of conducting a search." *McMorris*, 567 F.2d at 900.   Follow-up procedures used after the magnetometer has been triggered have also been characterized as "minimal." *R.I. Def. Att'ys Ass'n v. Dodd*, 463 A.2d 1370, 1372 (R.I. 1983).

[¶27]   Mr. Russell agrees that the use of a magnetometer and subsequent pat-down were not overly invasive.   He argues that the search in this case became too invasive when Deputy Jensen ordered him to open the snus can.   Other factually similar cases are instructive. *See Troudt*, 5 P.3d 349; *Plante*, 594 A.2d 165; and *Gillespie*, 103 A.3d at 120.

[¶28]   In *Troudt*, the defendant placed several items into a basket to be screened as she passed through a courthouse magnetometer. *Troudt*, 5 P.3d at 350.   One of the items was a leather cigarette case containing two compartments. *Id.*   The security guard opened the compartments "in order to ascertain whether [they] contained a knife, razor blade, or other sharp object." *Id.*   When he opened the smaller compartment, he found a packet containing a substance later determined to be methamphetamine. *Id.*   The trial court determined that the search was lawful, and the court of appeals affirmed, finding:

> that the nature of the security checkpoint was such that [the] defendant must have been aware that she would be subject to a search for weapons, that [the] defendant voluntarily consented to such a search of her cigarette case, and that the minimally intrusive search conducted by the guard did not exceed the scope of consent granted by [the] defendant.

*Troudt*, 5 P.3d at 351 (citing *Plante*, 594 A.2d 165).   Mr. Russell attempts to differentiate *Troudt* from the case at bar by arguing that in *Troudt* the defendant voluntarily consented to the search by placing her cigarette case into the basket.   In contrast, Mr. Russell contends he did not consent to the search of his snus can because it remained in his pocket under his direct control.   Ms. Troudt's placement of her cigarette case in the basket and the discovery of Mr. Russell's snus can after he passed through the magnetometer are distinctions without a difference.   In both cases "the element of voluntariness minimize[d] the intrusiveness of the procedure." *R.I. Def. Att'ys*, 463 A.2d at 1372. *See also Gillespie*, 103 A.3d at 116–20 (After appellant placed his Anacin bottle in a bin before entering the magnetometer, it was searched, revealing illegal drugs and paraphernalia.   The Superior Court of

Pennsylvania held the search was constitutional under the U.S. and Pennsylvania Constitutions.).

[¶29] In *Troudt*, and in *Gillespie*, the appellants were required to empty their pockets and place their items in a basket subject to search. The fact that Mr. Russell chose not to empty his pocket before the magnetometer alerted is not dispositive.

[¶30] Mr. Russell argues he did not consent to an uninterruptable search that extended to the contents of the snus can. He recognizes the contrary authority in cases such as *Plante* and asserts that his circumstances are distinguishable. In *Plante*, a courthouse bailiff found a packet of cigarette papers (often used to roll cigarettes, including marijuana cigarettes) and a throat lozenge tin in the defendant's purse. *Plante*, 594 A.2d at 166. The bailiff suspected the tin contained either illegal drugs or dangerous weapons. *Id.* As the bailiff searched the tin, the defendant attempted to get it back, asking him not to open it. *Id.* The bailiff found marijuana in the tin and placed the defendant under arrest. *Id.* The New Hampshire Supreme Court held that the search was reasonable under the special needs exception and found that the defendant did not have a right to terminate the search once it had commenced. *Id.* at 166–67. Mr. Russell argues that, unlike the bailiff in *Plante*, Deputy Jensen had no individualized suspicion that would have allowed him to open the can.

[¶31] The fact that the can could have contained a small weapon or substance that could be used to inflict harm on others objectively justified opening the can. *See Gillespie*, 103 A.3d at 120 (courthouse deputy opened pill bottle during screening). Deputy Jensen testified that before Mr. Russell entered the magnetometer there was "nothing . . . suspicious" about his behavior and that he did not know why he asked to see the contents of the can. *Supra* ¶ 8. Deputy Jensen's subjective intent is irrelevant. *See United States v. Small*, 944 F.3d 490, 502 (4th Cir. 2019) ("To determine whether the defendant maintains a reasonable expectation of privacy in an item, the court performs 'an objective analysis[.]'" (citation omitted)); *Ramos-Rivera v. Harlan*, No. 06-CV-02044-CMA, 2009 WL 663058, at *5 (D. Colo. Mar. 13, 2009) (validity of search must be determined by objective analysis and not the subjective intent of the officers); *Ramirez*, ¶ 20, 532 P.3d at 236 ("We apply an objective analysis of all the surrounding facts and circumstances to determine whether the officer was justified in making the stop."); *Speten v. State*, 2008 WY 63, ¶ 4, 185 P.3d 25, 27 (Wyo. 2008) ("The issue of the constitutionality of a search . . . [is] resolved by resort to an objective test, taking into account the totality of the circumstances, rather than analyzing the subjective thought process of the officer."). Indeed, "[i]f security officials were unable to inspect containers, which might conceal weapons or other items capable of causing injury, then the purpose of the search policy would be defeated." *Gillespie*, 103 A.3d at 119.

[¶32] Mr. Russell posits that instead of ordering him to open the can, Deputy Jensen should have instructed him to stow the tin elsewhere before entering the courtroom. He

argues that when Deputy Jensen looked into the can he conducted a broad search, not one narrowly tailored to accomplish the goal of preventing weapons from entering the courtroom. It is true that if Mr. Russell had left the courthouse, discarded the tin, and then returned, the goal of protecting the courthouse from potentially dangerous items would have been accomplished. However, this exercise was not constitutionally required. The United States Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *Vernonia*, 515 U.S. at 663, 115 S.Ct. at 2396. "[T]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers, because judges engaged in *post hoc* evaluations of government conduct can almost always imagine some alternative means by which the objectives of the [government] might have been accomplished." *Skinner*, 489 U.S. at 629 n.9, 109 S.Ct. at 1419 n.9 (citations and quotation marks omitted). The invasion does not need to be the least intrusive practicable; rather, we ask whether it resulted in a "significant" intrusion into Mr. Russell's privacy. *Vernonia*, 515 U.S. at 660, 115 S.Ct. at 2394; *see also Hageman*, ¶ 30, 256 P.3d at 497 ("undue intrusion").

[¶33] Here, the search was limited to opening Mr. Russell's snus can after the magnetometer alerted. The search was not significantly intrusive. This factor weighs in favor of the reasonableness of the search.

[¶34] Under the Fourth Amendment to the United States Constitution, an administrative or special needs search must be reasonable. Applying the three-part test to assess reasonableness, we find all three factors weigh against Mr. Russell. The government has a compelling interest in keeping weapons and other dangerous items out of the courthouse, Mr. Russell had no expectation of privacy in the snus can he transported through the magnetometer, and Deputy Jensen's inspection of the snus can and its contents was not significantly intrusive.

## *CONCLUSION*

[¶35] The district court correctly concluded that the search resulting in the discovery of the methamphetamine was lawful. We affirm.

11