2025 IL App (2d) 240237
No. 2-24-0237
Opinion filed August 11, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 23-CF-1186 |
| CLISHAUN LONG, | ) ) | Honorable Patricia S. Fix, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson concurred in the judgment and opinion.
Presiding Justice Kennedy dissented, with opinion.

**OPINION**

¶ 1   After a gun was found in his possession as he attempted to enter Six Flags Great America theme park (Six Flags) in Gurnee, defendant, Clishaun Long, was arrested and charged with various weapon offenses. Defendant moved to suppress evidence recovered during the warrantless search of his belongings. The trial court granted the motion, and the State now appeals. We reverse and remand for additional proceedings.

¶ 2                               I. BACKGROUND

¶ 3   On June 17, 2023, defendant and his wife attempted to enter Six Flags. Defendant was prevented from doing so after an X-ray scanner indicated that a bag he was trying to bring into the

park contained a gun. Defendant was subsequently arrested and charged with one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)) and two counts of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(A-5); (a)(1) (a)(3)(C)). On December 13, 2023, defendant filed a motion to suppress evidence, arguing that he was detained without cause and that the police search of his bag was illegal.

¶ 4 On February 7, 2024, the trial court conducted a hearing on defendant's motion to suppress evidence. David Angelici, Six Flags' security supervisor, testified that firearms are not permitted in Six Flags. There are signs informing guests of this fact when they drive into the park. As such, no guest may enter Six Flags without a security screening, which first entails passing through a metal detector that sets off an alarm if a "higher" metal density is detected on the guest's person or in a personal bag. The detector generates an image showing the location of the higher metal density, whether on the guest's person or in an accompanying bag. After the alarm is set off, security personnel determine the type of secondary screening that is appropriate. Depending on whether the metal object is detected on the guest's person or in a personal bag, the secondary screening entails scanning the guest's person with a hand wand or running the bag through an X-ray scanner to determine whether it contains any items prohibited by Six Flags. Images on the X-ray determine the next step in the screening process. If a guest does not want to proceed with a secondary screening, the individual is permitted to leave.

¶ 5 On the day in question, Angelici was alerted that Six Flags' X-ray scanner was displaying an image of a gun in a guest's diaper bag. Angelici proceeded to the X-ray scanner and saw a clear image of a handgun on the scanner's screen. Angelici took the bag and identified defendant as the guest who brought the bag to Six Flags. Defendant asked if he could take the gun back to his car. Angelici told him that he could not as the Gurnee police would determine if defendant had a

concealed carry license (CCL) or some other reason to allow him to return the weapon to his car. Angelici asked defendant if he had a CCL. Defendant replied that he did not.

¶ 6    Angelici testified that he never opened the bag. He waited with defendant for Gurnee police officers to arrive. He explained that the Gurnee Police Department had officers stationed at Six Flags in a small on-site office near the entrance. When the officers arrived, Angelici informed them that the bag was defendant's and that there was a gun inside. He handed them the bag. The officers then escorted defendant to their on-site office.

¶ 7    Gurnee police officer Nathaniel Rock testified that he and his field training officer were at Six Flags to assist Officer Butur (first name not given) on the day of the incident. After learning that Six Flags' security personnel might have discovered a weapon, the officers went to assist. It took them 10 to 20 seconds to get from their office to the Six Flags security gate. As soon as he and Butur got to the security gate, he heard defendant saying that he had a gun in the bag. He heard Six Flags' security personnel asking defendant if he had a CCL or a Firearm Owners Identification (FOID) card and defendant responding that he had neither. Rock and the other officer then asked defendant and his wife if either of them had a CCL or a FOID card. They confirmed that they did not.

¶ 8    Rock saw that Six Flags' security personnel had a bag, which they said contained a weapon. Butur took the bag and escorted defendant and his wife to the Gurnee Police Department's on-site office. Rock considered defendant and his wife "detained" at that point "for investigation." Defendant did not give the officers his name, but they learned it from his wife and confirmed that defendant was not legally allowed to possess a gun.

¶ 9    At the time of the incident, Rock was wearing a body camera. A video recording from the camera was admitted into evidence and played at the hearing. The video showed, *inter alia*, a Six

Flags security officer hand a bag to a Gurnee police officer. That officer brought the bag to the Gurnee Police Department's on-site office and placed it on the floor behind a desk. There was a bench running along the wall opposite the desk. Throughout the encounter shown on the video recording, defendant was either seated on or standing directly in front of the bench. Eventually, Rock picked up the bag and took it to a different room. A few minutes later—roughly 20 minutes after defendant was brought into the office—Rock and another officer began removing various items from the bag, including cloths or towels, a zippered pocketbook or wallet, and plastic bags containing various objects. They also retrieved and opened a zippered case with a loaded handgun inside. Rock testified that defendant's Social Security card was found in the case next to the weapon.

¶ 10     At the close of the hearing, the trial court granted defendant's motion to suppress evidence. The trial court found that the warrantless search of the bag implicated defendant's fourth amendment rights (see U.S. Const., amend. IV). The trial court further found that none of the exceptions to the warrant requirement applied.

¶ 11     Following the denial of its motion to reconsider, the State filed a timely notice of appeal.

¶ 12                      II. ANALYSIS

¶ 13     On appeal, the State argues that the trial court erred in concluding that the warrantless search of the bag was unlawful. The State contends that the fourth amendment was not implicated because defendant voluntarily consented to the search of his belongings by security in order to enter the park. The State further insists that the police officers did not need a warrant to search defendant's bag once they had probable cause to believe that defendant's bag contained a gun.

¶ 14     In response, defendant does not dispute that he consented to his bag being screened by Six Flags' security personnel. He also does not deny that his bag contained a gun and that the police

were justified in seizing his bag while they investigated. He insists, however, that he never consented to the Gurnee police officers searching his bag and that their search violated his fourth amendment rights. He therefore maintains that the trial court properly granted his motion to suppress.

¶ 15    Defendant bears the burden of proving a search was unlawful in a motion to suppress. 725 ILCS 5/114-12(b) (West 2022). In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). Where neither the facts nor credibility of the witnesses is at issue, we may conduct a *de novo* review to determine if law enforcement had sufficient facts to support their decision to search. *People v. Froio*, 198 Ill. App. 3d 116, 121 (1990). Our review as to the ultimate question of whether the motion to suppress should be granted is *de novo*. *People v. McCavitt*, 2021 IL 125550, ¶ 53.

¶ 16    The fourth amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "Accordingly, to claim the protection of the fourth amendment, a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched and that his or her expectation is reasonable." *People v. Pitman*, 211 Ill. 2d 502, 514 (2004). Our supreme court has stated that the following factors should be considered when determining whether a defendant possessed a reasonable expectation of privacy in the place searched:

"(1) ownership of the property searched; (2) whether the defendant was legitimately present in the area searched; (3) whether defendant has a possessory interest in the area or

property seized; (4) prior use of the area searched or property seized; (5) the ability to control or exclude others from the use of the property; and (6) whether the defendant himself had a subjective expectation of privacy in the property." *Id.* at 520-21.

¶ 17　Under the privacy-based approach, the fourth amendment protects a person only to the extent that the person has a subjective expectation of privacy in the area searched that society recognizes as reasonable. *Id.* "Whether one has a legitimate expectation of privacy in an area searched is measured by an objective standard drawn from common experience." *People v. Rosenberg*, 213 Ill. 2d 69, 78 (2004). The burden of establishing a legitimate expectation of privacy lays with the defendant. *Id.* Whether a defendant has a legitimate expectation of privacy is determined by the totality of the circumstances of the particular case. *People v. Johnson*, 114 Ill. 2d 170, 192 (1986). There is no bright-line rule. *McCavitt*, 2021 IL 125550, ¶ 60.

¶ 18　It is well-recognized that a person does not have a "reasonable expectation of absolute privacy" in certain places "where all members of the public [are] subject to a routine search." *Commonwealth v. Gillespie*, 103 A.3d 115, 120 (Pa. Super. Ct. 2014). "[B]y presenting oneself at a sensitive facility's security checkpoint, one implicitly consents to the screening and search of one's belongings." *Day v. State*, 829 S.E.2d 418, 420 (Ga. Ct. App. 2019) (citing *United States v. Herzbrun*, 723 F.2d 773, 776 (11th Cir. 1984) ("those presenting themselves at a security checkpoint thereby consent automatically to a search, and may not revoke that consent if the authorities elect to conduct a search")); *McSweeney v. State*, 358 S.E.2d 465, 467 (Ga. Ct. App. 1987) (passenger who presents himself to an airport security checkpoint has consented to the screening of his luggage and his person). Accordingly, "when a person with notice of such impending search seeks entry into such a restricted area, he or she relinquishes any reasonable

expectation of privacy and impliedly consents to the search." *People v. Rincon*, 581 N.Y.S.2d 293, 295 (App. Div. 1992).

¶ 19 Here, Six Flags posts signs stating that firearms are not permitted in the park. Before entering the park, Six Flags requires all guests to pass through a metal detector screening. As the screening area is situated immediately in front of the park entrance, it is obvious to all guests that they must submit to that screening before entering the park. If, upon reaching that security check, a guest elects to proceed through it, then he necessarily "relinquishes any reasonable expectation of privacy and impliedly consents to the search." *Id.*

¶ 20 Defendant insists that he had the right to limit what type of search Six Flags' security personnel could conduct. Specifically, he maintains that he only consented to an X-ray search of his belongings and not a tactile search. In making this argument, defendant miscomprehends his relationship with Six Flags. In *United States v. Francoeur*, 547 F.2d 891, 893-94 (5th Cir. 1977), the Fifth Circuit discussed the relationship between an amusement park (in that case, Disney World) and its guest:

> "Disney World is not an open town fully accessible and available to all commerce. This private property is an amusement park to which admission is charged. *** No one is permitted into the outer gates of Disney World except by consent of the owners.
>
> If the owners of this amusement park impose in an illegal manner on their clientele, such imposition, if in violation of statutes forbidding trespass, assault, false arrest, or any other offense, would subject the owners to a civil suit on behalf of the injured person. Such illegal conduct would not, however, give them the protection of the Fourth Amendment and the exclusionary rule which has developed from it."

¶ 21    As such, in a relationship between an amusement park and a guest, the matter of consent resides with the owners of an amusement park. *Id.* For the owners of the park to consent to someone entering its private property, it may require that person to consensually undergo a search for firearms or other prohibited items. This is inherently reasonable on at least two grounds. First, the amusement park's business would likely suffer through reduced attendance if potential visitors were concerned that fellow visitors to the park were carrying firearms. See generally *United States ex rel. Sanders v. Allison Engine Co.*, 196 F.R.D. 310, 314 (S.D. Ohio 2000) (observing that it would be bad for business for companies to abandon safety reviews). Second, by inadequately monitoring whether guests were bringing firearms into the park, the amusement park could be subjecting itself to civil liability for failing to take precautions to keep people with firearms out of the park. See *Barr v. Cunningham*, 2017 IL 120751, ¶ 20 (describing willful and wanton conduct as the failure to take reasonable precautions after having knowledge of impending danger).

¶ 22    Of course, this principle does not allow an amusement park to conduct a search in an outrageous fashion because, as *Franceour* states, that too could lead to civil liability. *Francoeur*, 547 F.2d at 893-94. However, nothing in this case suggests that the search of defendant's bag was overzealous. As such, if a person does not want to subject himself or his belongings to a search, his recourse is to not go into the park. See *MacWade v. Kelly*, 460 F.3d 260, 270 (2d Cir. 2006) (an individual may avoid search of his bag under the Metropolitan Transportation Authority's mass transit search program as long as he leaves the subway). Once he decides to enter the amusement park, he does not have the power to limit the type of search that security personnel may conduct of his belongings.

¶ 23    We recognize here that Six Flags' search consisted of only a metal detector and an X-ray machine. However, that does not mean that defendant consented to only those type of searches.

Angelici explained that "[t]he images on the x-ray machine will determine what the next step potentially would be." If the images on the X-ray are inconclusive as to what the heavy metal object is, then the next logical step would have been for the security personnel to conduct a search of the bag by hand to determine what the heavy metal object was. See *Russell v. State*, 2024 WY 126, ¶ 19, 559 P.3d 597 (Wyo. 2024) ("[f]ollow-up searches conducted after an x-ray or magnetometer has alerted, including pat-downs and examination of the contents of items, are also common and effective measures taken at *** security checkpoints"); see also *Herzbrun*, 723 F.2d at 778 (upholding as reasonable follow-up search after bag passed through X-ray machine). It is apparent that the search did not proceed further because the image on the X-ray was not inconclusive—it clearly revealed a gun—and because defendant acknowledged that there was a gun in the bag and that he did not possess a CCL or FOID card.

¶ 24    The next issue becomes the relationship between the search defendant consented to by Six Flags' security personnel and the later search by the Gurnee police officers. Our supreme court discussed this type of relationship in *People v. Phillips*, 215 Ill. 2d 554, 566-67 (2005), stating:

> "The fourth amendment applies only to government action. *United States v. Jacobsen*, 466 U.S. 109, 113 *** (1984). A search by a private person does not violate the fourth amendment. *Jacobsen*, 466 U.S. at 115 ***. Further, the fourth amendment does not prohibit the government from using information discovered by a private search, because the private search has already frustrated any expectation that the information will remain private. *Jacobsen*, 466 U.S. at 117 ***. 'The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. In such a case the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a

warrant.' *Jacobsen*, 466 U.S. at 117-18 ***. Thus, where the government uses privately discovered information to investigate a crime without first obtaining a warrant, the fourth amendment question is whether the investigation 'exceeded the scope of the private search.' *Jacobsen*, 466 U.S. at 115 ***."

¶ 25    Here, as defendant consented to his bag being searched by Six Flags' security personnel, any expectation of privacy had already been relinquished by the time that the Gurnee police officers searched his bag. The police officers' subsequent search revealed no new material information but rather confirmed what they already knew—that defendant had a gun in his bag. Thus, the police officers' search of defendant's bag did not exceed the scope of Six Flags' search and did not violate defendant's fourth amendment rights. See *People v. Clendenin*, 238 Ill. 2d 302, 329 (2010) (police search does not exceed the scope of a private search if it merely confirms the results of private search or obtains no new material information).

¶ 26    Defendant insists that the Gurnee officers' tactile search of his bag was more invasive than the X-ray scan Six Flags' security personnel conducted and therefore necessarily exceeded the scope of that private search. This argument relies on the premise that he had the power to limit what type of search Six Flags' security personnel conducted. As explained earlier, once he decided to submit the bag to X-ray screening, his expectation of privacy was thwarted, and he could not limit what type of search was conducted. See *Russell*, 2024 WY 126, ¶ 19. Further, as the screening revealed contraband—the gun which defendant admitted he was not allowed to possess—that also eliminated any privacy interest he had in the continued possession of the firearm. See *People v. Hill*, 2020 IL 124595, ¶ 29 ("No one possesses a legitimate interest in contraband.").

¶ 27    Defendant next argues that the police search went beyond the scope of Six Flags' search because it led to new material information; that the gun was loaded with ammunition and that

defendant's Social Security card was in a zippered case with the gun. Defendant's argument is flawed because it again maintains that he had some expectation of privacy in his bag after he submitted it to an X-ray screening. Once that X-ray scan revealed a gun, which defendant acknowledged he was not authorized to have, he lost all possessory interest in that gun as well as the ammunition therein. *Id.* Further, as to his Social Security card, beyond having no privacy interest in the bag he submitted for screening, we also note that the card provided no new material information to the police. At most, the Social Security card connected defendant to the gun. However, that was not new information as the police officers were already aware that defendant had acknowledged that the gun was his.

¶ 28    As defendant did not have a privacy expectation in his bag, the trial court erred in holding that the police needed a warrant to search that bag. See *Clendenin*, 238 Ill. 2d at 331. We note that this determination is also consistent with our supreme court's decision in *People v. Jones*, 215 Ill. 2d 261 (2005). In *Jones*, our supreme court considered whether a police officer needed a warrant to search a container (a "one-hitter" box) which he believed contained contraband (cannabis). The *Jones* court discussed how:

> "the United States Supreme Court has 'made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' " *Id.* at 269 (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)).

¶ 29    The *Jones* court then explained one of the recognized exceptions to the warrant requirement—the plain view doctrine:

"During [an] investigative stop, police may seize an object without a warrant if the encounter meets the requirements of the plain view doctrine: (1) the officers are lawfully in a position from which they view the object; (2) the incriminating character of the object is immediately apparent; and (3) the officers have a lawful right of access to the object. [*Minnesota v. Dickerson*, 508 U.S. 366, 374-75 (1993)] (and cases cited therein). The ' "seizure of property in plain view involves no invasion of privacy *and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity*." ' (Emphasis in original.) *Texas v. Brown*, 460 U.S. 730, 741-42 *** (1983) (plurality op.), quoting *Payton v. New York*, 445 U.S. 573, 587 *** (1980). 'Plain view' requires probable cause to permit a seizure. *Arizona v. Hicks*, 480 U.S. 321, 326 *** (1987). However, if police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object, *i.e.*, if the incriminating character of the object is not immediately apparent, the plain view doctrine cannot justify the seizure. *Dickerson*, 508 U.S. at 374-75 *** (and cases cited therein)." *Id.* at 271-72.

¶ 30    The supreme court then expounded:

"However, where the contents of a seized container are a foregone conclusion, this prohibition against warrantless searches of containers under the plain view doctrine does not apply. Courts have held that when a container is 'not closed,' or 'transparent,' or when its 'distinctive configuration proclaims its contents,' the container supports no reasonable expectation of privacy and the contents thereof can be said to be in plain view. Where law enforcement officers already possess knowledge as to the contents of the container, the search of the container does not unreasonably infringe upon the individual interest in preserving the privacy of those contents." *Id.* at 279.

Applying these principles, the supreme court found relevant the police officer's training and experience that indicated "one-hitter" boxes contained cannabis. *Id.* at 281. The supreme court then held that, based on the officer's training and experience, his seizure and search of the defendant's "one-hitter" box did not violate the defendant's fourth amendment rights. *Id.* at 281-82.

¶ 31    This case presents a textbook example of when the contents of a seized container can be considered a foregone conclusion. Here, at the time the police officers seized defendant's bag, they knew (1) Six Flags' security personnel had observed a gun in defendant's bag on an X-ray scan and (2) defendant himself had acknowledged in their presence that there was a gun in the bag. The police officers also knew from defendant's statements that he did not have a right to possess that gun. Based on the police officers' knowledge that defendant's bag contained a gun, they had probable cause to associate defendant's bag with criminal activity. See *id.* at 272. Their subsequent search of defendant's bag therefore did "not unreasonably infringe upon the individual interest in preserving the privacy of those contents." *Id.* at 279.

¶ 32    We note that the record herein supports a finding that the contents of the container was a "foregone conclusion" even more so than in *Jones*. There, the supreme court explained that, based on the officer's training and education, the officer had a "virtual certainty" that the "one-hitter box" he observed contained cannabis. *Id.* at 282. Here, the record demonstrates that the police officers had absolute certainty that a gun was in the bag because both Six Flags' security personnel and defendant had said as much.

¶ 33    Defendant attempts to distinguish *Jones* on the basis that *Jones* only applies to the search of automobiles. Although *Jones* involved a police officer's search of a vehicle, the supreme court never stated that its analysis was somehow restricted to vehicle searches. Indeed, in explaining its

decision, the supreme court relied on cases that did not involve vehicle searches. See *id.* at 279 (citing *United States v. Williams*, 41 F.3d 192, 197-98 (4th Cir. 1994) (involving search of suitcase at airport), and *United States v. Eschweiler*, 745 F.2d 435, 440 (7th Cir. 1984) (involving search of envelope found in overcoat in the defendant's apartment and seizure of a key therein)). Moreover, numerous courts have since applied *Jones* to situations that did not involve vehicle searches. See, *e.g.*, *People v. Jannusch*, 2021 IL App (2d) 190676-U ¶¶ 5, 19 (involving search of the defendant's purse at a bookstore); *People v. Jordan*, 2021 IL App (3d) 190638-U, ¶¶ 7, 40 (involving search at the defendant's apartment); *People v. Garrett*, 2013 IL App (1st) 110597-U ¶¶ 3, 14 (involving search of the defendant on a sidewalk).[1]

¶ 34     Accordingly, as defendant's consent to a private search of his bag revealed a gun that he was not legally allowed to possess, the police officers were authorized to search defendant's bag without a warrant based on (1) defendant's consent and (2) probable cause as the police officers' knowledge that defendant's bag contained a gun was a "foregone conclusion." The trial court therefore erred in suppressing the evidence that the police officers discovered when searching that bag. See *Clendenin*, 238 Ill. 2d at 331.

¶ 35     In so ruling, we note that the dissent goes to great lengths to denigrate our opinion as contrary to "existing precedent" and leading to an "unwarranted and unwise expansion of fourth amendment exceptions." *Infra* ¶ 44. In doing so, the dissent premises its argument on facts contrary

---

[1]Even though these decisions were unpublished, we may still consider them as persuasive authority. See Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) ("a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes"); *People v. Ingram*, 2020 IL App (2d) 180353, ¶ 21 n.1 (considering unpublished orders entered before January 1, 2021, as persuasive authority).

to both the record and common sense. The dissent claims that there was no testimony as to the "presence of any signage or other form of notice that all bags and personal items are subject to physical search." *Infra* ¶ 50. Such an assertion ignores Angelici's testimony that (1) there are signs in the park informing guests that firearms are not permitted at Six Flags and (2) every guest must pass through a security screening before entering the park. Based on Angelici's testimony, it is apparent that every reasonable person attending Six Flags is put on notice that firearms are not allowed in the park and that Six Flags will enforce that rule by requiring guests to pass through a security screening before entering the park. If that security screening reveals a possible firearm, no reasonable person could believe that Six Flags would not have the right to investigate further, which may include a physical search.

¶ 36    We have found no published opinion that considers that point controversial. See *Gillespie*, 103 A.3d at 120 (person does not have a "reasonable expectation of absolute privacy" in certain places "where all members of the public [are] subject to a routine search"); *Day*, 829 S.E.2d at 420 ("by presenting oneself at a sensitive facility's security checkpoint, one implicitly consents to the screening and search of one's belongings"); *Herzbrun*, 723 F.2d at 776 ("those presenting themselves at a security checkpoint thereby consent automatically to a search, and may not revoke that consent if the authorities elect to conduct a search"); *McSweeney*, 358 S.E.2d at 467 (passenger who presents himself to an airport security checkpoint has consented to the screening of his luggage and his person); *Rincon*, 581 N.Y.S.2d at 295 ("when a person with notice of such impending search seeks entry into such a restricted area, he or she relinquishes any reasonable expectation of privacy and impliedly consents to the search").

¶ 37    The dissent attempts to distinguish the above cases on the basis that an amusement park such as Six Flags is not a "sensitive facility" (*infra* ¶¶ 58-60) like the courthouses or airports at

issue in those cases. The dissent's premise for this argument seems to be that certain places like courthouses, occupied by judges, lawyers, and elected officials, are entitled to more security than places such as amusement parks, where attendees include families and young children. Although the dissent is entitled to that opinion, it is not consistent with any court precedent or public policy in our country.

¶ 38    Again, we emphasize that it was defendant's burden to prove that the search at issue was unlawful in his motion to suppress. 725 ILCS 5/114-12(b) (West 2022)). In order to meet that burden, defendant had to "demonstrate that he *** personally ha[d] an expectation of privacy in the place searched and that his *** expectation [was] reasonable." *Pitman*, 211 Ill. 2d at 514. Defendant did not have a reasonable expectation of privacy in the bag once he consensually submitted it for screening. *Day*, 829 S.E.2d at 420. As such, the trial court erred in granting defendant's motion to suppress the evidence recovered from the bag.

¶ 39                                    III. CONCLUSION

¶ 40    For the reasons stated, we reverse the judgment of the circuit court of Lake County suppressing the evidence recovered from defendant's bag. We remand for additional proceedings.

¶ 41    Reversed and remanded.

¶ 42    PRESIDING JUSTICE KENNEDY, dissenting:

¶ 43    This is a straightforward case in which a police search exceeded the scope of a private search without a warrant or an exception to the fourth amendment's warrant requirements. The police here had ample time to obtain a search warrant or simply ask for consent to search;[2] instead,

_____

[2]Officer Rock testified that Gurnee P.D. use a "consent to search" form but said they do not use it "when we have probable cause to search an item," confusing the probable cause standard to seize an item

they proceeded to open a closed bag and search all of its contents—including a smaller closed container which they also opened—in order to find the gun in question. In fact, police were merely told about the gun by private security; they were not shown an X-ray image nor did they view any image of the gun before conducting their search. Simply stated, under these circumstances, the police search violated the fourth amendment.

¶ 44    However, instead of affirming the trial court's suppression of the fruits of this illegal search consistent with the facts and existing precedent, the majority now declares that every person in Illinois who submits a container of their personal effects for an X-ray by private security not only gives up all expectation of privacy in such effects but also impliedly consents to a full and invasive manual search of all items in the container by police—whether or not police observe the X-ray search or view its resulting images. The facts of this case do not support such an unwarranted and unwise expansion of fourth amendment exceptions, which portend a significant potential contraction of individuals' rights to be free from unreasonable government searches in public accommodations that employ or contract with private security guards. For these reasons and those that follow, I respectfully dissent.

¶ 45    The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The United States Supreme Court has interpreted the fourth amendment "as establishing rules and presumptions designed to control the conduct of law enforcement officers that may significantly intrude upon privacy interests." *Illinois v. McArthur*,

---

with the standard necessary to conduct an invasive search. Officer Rock also testified that neither he nor his fellow officers called the state's attorney's office prior to conducting their search of the bag.

531 U.S. 326, 330 (2001). Police searches conducted without warrants are presumptively unreasonable. *Groh v. Ramirez*, 540 U.S. 551, 572 (2004) (Thomas, J., dissenting, joined by Scalia, J.); *Katz v. United States*, 389 U.S. 347, 357 (1967) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions").

¶ 46    The government is required to show that any warrantless search was valid under an exception to the warrant requirement. *United States v. Doe*, 61 F.3d 107, 111 (1st Cir. 1995). It is well established that "[a] warrant is generally required for the search of luggage or any other container of personal effects." *People v. Bayles*, 82 Ill. 2d 128, 141 (1980); see *United States v. Chadwick*, 433 U.S. 1, 13 (1977) ("[A] person's expectations of privacy in personal luggage are substantially greater than in an automobile."). Moreover, "a defendant can have a legitimate expectation of privacy with respect to contraband placed in a closed, opaque container to conceal it." *State v. Ramires*, 152 S.W.3d 385, 400 (Mo. Ct. App. 2004).

¶ 47    Although probable cause "may support the warrantless *seizure* of an enclosed opaque container [citation], the *same* probable-cause showing is not necessarily sufficient to justify its subsequent warrantless *search*." (Emphases in original.) *Doe*, 61 F.3d at 111 (distinguishing a seizure, which is merely a temporary deprivation of a possessory interest, from a search, which entails an intrusion upon privacy interests as well). Thus, "once an exigency ends, as by an arrest or the seizure and custodial retention of a container by the police, a *neutral judicial officer* must authorize any subsequent search on a showing of probable cause." *Id.* (Emphasis in original). As this court has put it, there is a "critical distinction between the police being in lawful possession of defendant's briefcase and their being lawfully inside of it." *People v. Hamilton*, 56 Ill. App. 3d 196, 200 (1978).

¶ 48    The majority here, in holding that the police needed no warrant to open the diaper bag and rummage through it, concludes that (1) when defendant consented to the limited X-ray search conducted by Six Flags security personnel, he no longer had any expectation of privacy in the contents of the bag; (2) the search by Gurnee police did not exceed the scope of the private search conducted by Six Flags security personnel; and (3) because it was a "foregone conclusion" that the diaper bag contained contraband, no warrant was required under the plain view exception. None of these overlapping (and sometimes circular) conclusions are justified under the facts of this case.

¶ 49    As an initial matter, it should be noted that this record is not a sound factual foundation upon which the majority can build its expansive legal holdings. As will be discussed in more detail, crucial facts are missing from the record that might have justified the court's conclusions, but without which the majority's holdings collapse. Only two witnesses testified at the hearing and neither witnessed defendant's actions at the magnetometer and X-ray machine. Only one of the four (or perhaps five) police officers testified; his was the only body cam video entered into evidence, and some of its audio is flatly inconsistent with the testimony.

¶ 50    More importantly, missing from the record is the factual support necessary for any of the majority's three main holdings. First, no one testified as to the presence of any signage or other form of notice that all bags and personal items are subject to physical search, which might have justified the assertion that defendant impliedly consented to a full physical search of the diaper bag. Second, no private security employee actually opened the diaper bag, which, if they had, would certainly have supported a subsequent police search of the same scope. Finally, no one testified that the police ever saw the X-ray or resulting image, nor that any officer's experience and training supported his conclusion that the item was in fact a gun; such combined testimony

might conceivably have justified the majority's expansion of the plain view exception via the "foregone conclusion" line of cases.

¶ 51     Without the support of facts in the record, the majority nonetheless proceeds to make new law. As discussed below, its legal conclusions are likewise unsupported.

¶ 52     A circuit court's ruling on a motion to suppress is reviewed under a two-part test: the court's factual findings may be rejected only if they are against the manifest weight of the evidence; however, when the reviewing court analyzes the issues in light of the established facts, it reviews *de novo* the trial court's legal conclusions. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). Whether consent has been given is a question of fact to be determined initially in the circuit court. *People v. Pitman*, 211 Ill. 2d 502, 527 (2004). Because appellate courts are not in a position to observe witnesses as they testify, "[w]hen the evidence on the issue of consent is conflicting, this court will uphold the circuit court's finding unless it is clearly unreasonable." *Id.*

¶ 53     Here, after hearing the witnesses, seeing the body camera video, and hearing the audio, the trial court found that the government failed to establish an exception to the fourth amendment's warrant requirement, that defendant's consent to search was limited consistent with the limited private search conducted by Six Flags security, and that the police search exceeded that of Six Flags. The court found that defendant did not implicitly or explicitly consent to a physical search of the diaper bag or its contents, nor were the police otherwise justified under the facts presented. These were reasonable factual findings based on the evidence presented, to which this court should defer. *Id.* ("After reviewing the evidence presented at the suppression hearing, we cannot say that the circuit court's finding of no consent was unreasonable.").

¶ 54     First, the trial court was correct in finding that defendant gave only limited consent to a limited private search. Initially, by reportedly pushing the stroller through the metal detector,

defendant impliedly consented to that type of screening, which simply detects the presence of "a high density of metal," according to Six Flags' security supervisor Angelici. The use of a magnetometer as a screening measure for personal effects is a type of "search" within the meaning of the fourth amendment. *United States v. Epperson*, 454 F.2d 769, 770 (4th Cir. 1972). Next, by placing the diaper bag on the X-ray belt, defendant consented to the taking of an X-ray image scan of the diaper bag from outside the bag. An X-ray scan is also a search, although it "is certainly a more intrusive device than the magnetometer." *United States v. Henry*, 615 F.2d 1223, 1227 (9th Cir. 1980).

¶ 55 However, these are both limited types of searches; neither is as intrusive as a "physical search."[3] *Id.* This is true despite the "express purpose [of magnetometers and X-ray scanners] *** to search for guns and explosive devices." *Id.* In fact, the X-ray scanner serves to "insure that the screening process is no more extensive or intensive than necessary." *Id.* at 1228.

¶ 56 It is self-evident that a physical search made by opening an opaque container with personal effects inside is more intrusive than a magnetometer or X-ray; the latter methods merely scan the container from the outside for the presence of only certain types of materials and do not involve opening and entering a closed container. Because opening and physically searching the bag by the police in this case was more intrusive than the magnetometer and X-ray "searches" made by private security personnel, it is equally clear that the police search exceeded the scope of the private search.

---

[3]The majority's use of the term "tactile" to describe the search is misleading. Tactile means "perceptible by touch." Merriam-Webster's Collegiate Dictionary (11th ed. 2020). The term is typically used to describe searches made by feeling or pressing a person's pockets or purse or other items, not opening a container.

Consenting to one limited type of search is not co-extensive with unlimited consent to any and all types of searches. See *Florida v. Jimeno*, 500 U.S. 248, 252 (1991).

¶ 57    The majority brushes past the limited scope of defendant's consent and the relative extent of the private and police searches that were actually conducted here, in favor of making a sweeping declaration that, by placing the diaper bag on the X-ray belt, defendant forfeited all expectation of privacy concerning the bag and its contents. For support, the majority cites several cases without adding any analysis beyond a single quotation from each. Each case is clearly distinguishable.

¶ 58    For example, *Day v. State*, 829 S.E.2d 418, 419 (Ga. Ct. App. 2019), concerned the law enforcement special needs exception for "sensitive facilities," an exception to the fourth amendment which has only been applied to "[a]irports, governmental buildings, and detention facilities." The defendant in *Day* "was a convicted offender reporting to a probation appointment" by entering a state probation office, which the court found " 'presents special needs that may justify departures from the usual warrant and probable-cause requirements.' " *Id.* at 420 (quoting *Whitfield v. State*, 786 S.E.2d 547, 550 (Ga. Ct. App. 2016)). The *Day* court added that the defendant's "probationary status alone is yet another factor supporting the conclusion that Day had a diminished expectation of privacy in the contents of her purse when she arrived at the [government facility]." *Id.* at 420-21. Finally, "[n]otices posted on the walls inform[ed] those entering the facility that anything on the person is subject to search." *Id.* at 419. "[M]ultiple signs clearly warn[ed]" of diminished privacy, and, the court noted, "by presenting oneself at a *sensitive facility's* security checkpoint, one implicitly consents to the screening *and* search of one's belongings." (Emphases added.) *Id.* at 420. The *Day* court even clarified that special needs searches were " '*limited* searches at sensitive facilities.' " (Emphasis added.) *Id.* at 419 (quoting *McMorris v. Alioto*, 567 F.2d 897, 899 (9th Cir. 1978). Here, in contrast, an amusement park is

not considered a "sensitive facility," such as an airport or governmental or detention facility; defendant was not subject to diminished expectations of privacy at the park because of his probationary status; and there is no evidence that any notices were posted to give defendant any reason to believe his personal items would be searched by hand, either by Six Flags personnel or anyone else. The concurrence in *Day* pointed out that "a limited warrantless search of a person under this exception is only lawful if 'conducted as part of a general regulatory scheme in furtherance of an administrative purpose.' " *Id.* at 421 (Barnes, P.J., specially concurring) (quoting *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973)). No such regulatory scheme was in place here. Simply put, *Day* is inapplicable to the facts of the instant case.

¶ 59    Next, the majority cites *Commonwealth v. Gillespie*, 103 A.3d 115, 116 (Pa. Super. Ct. 2014), which concerned a police search at the entry point to a courthouse (another sensitive government facility), conducted pursuant to a court administrative order granting authority to the sheriff to search " '[a]ll packages, briefcases and other containers in the immediate possession of persons entering [the] Courthouse property.' " The court held that "the government has a substantial interest in preventing people from bringing weapons into court facilities" and that the courthouse's administrative order furthered that interest without being excessively intrusive. *Id.* at 119-20. Further, the defendant was "on notice he would be searched. A sign posted at the courthouse entrance informed visitors they must pass through a metal detector, they may be searched, and 'Any item that has the potential to cause harm will be confiscated.' " *Id.* at 120. Again, unlike a courthouse, Six Flags is not cognizable as a "sensitive facility." Also, no regulatory or administrative scheme was in place at Six Flags pursuant to any special law enforcement needs, and there was no evidence that a notice was posted advising that bags and personal items were subject to physical search.

¶ 60　　Third, *United States v. Herzbrun*, 723 F.2d 773, 776 (11th Cir. 1984), concerned a search by security personnel[4] at an airport checkpoint. The *Herzbrun* court was careful to explain that "airport security checkpoints and loading gates are sui generis under the fourth amendment." *Id.* at 775. The court explained that, "[d]ue to the intense danger of air piracy, we have long held that these areas, like international borders, are 'critical zones' in which special fourth amendment considerations apply." *Id.* Additionally, similar to *Day*, in *Herzbrun*, "[s]igns posted on the concourse informed passengers that if they passed through the checkpoint they would be subject to a search." *Id.* at 774.

¶ 61　　Other "special needs" and "sensitive facilities" cases cited by the majority are likewise inapposite. See *Russell v. State*, 2024 WY 126, ¶ 6, 559 P.3d 597 (Wyo. 2024) (courthouse security checkpoint search by sheriff's deputy); *People v. Rincon*, 581 N.Y.S.2d 293 (App. Div. 1992) (courthouse search, where signs alerted visitors that " '[a]ll persons entering this area must pass through a detector device and submit to personal search if warranted' "); *McSweeney v. State*, 358 S.E.2d 465 (Ga. Ct. App. 1987) (airport security checkpoint search).

¶ 62　　Undaunted, the majority implies that amusement parks like Disney World are equivalent to a "sensitive facility" justifying diminished fourth amendment protection for its invitees, citing *United States v. Francoeur*, 547 F.2d 891 (5th Cir. 1977). But that case does not stand for any such

---

[4]The court noted the employment of the two individuals conducting the search was "pursuant to security procedures mandated by the Federal Aviation Administration at 14 CFR § 121.538 (rev. 1979)" (*Herzbrun*, 723 F.2d at 774 n.1), which refers to "certificate holders," which are defined in the Code of Federal Regulation as, *inter alia*, "air carriers" (14 C.F.R § 117.3 (2025)). While the *Herzbrun* court did not distinguish between private versus government searches, it appears the security personnel in that case were contractors, not government employees.

proposition; it merely analyzes the scope of a *private* property owner's search of a guest, saying merely that an owner may require a guest to undergo a search as a condition of consent to entry on private property. *Id.* at 893-94. Amusement parks are not recognized by our law as "sensitive facilities" requiring special law enforcement needs to reduce fourth amendment protections. *Franceour* merely restates the axiomatic proposition that "the Fourth Amendment gives protection only against unlawful governmental action," not against private actors. *Id.* at 893. As at Disney World, Six Flags could decide to impose any level of search it wanted as a condition of entry without violating the fourth amendment, simply because they are not governmental actors and are not subject to the fourth amendment.[5] And just because they *could* impose stricter search requirements does not mean they actually did so. Six Flags required a magnetometer screening and, in case of an alert, an X-ray, not a full physical search of guests' belongings. Their policy was actually to the contrary; Angelici testified that "the policy is to hold it for verification," which he did "until [he] could give it to Gurnee officers." But even if Six Flags had a blanket requirement that its security personnel physically search guest bags, its personnel did not conduct such a search in this case. Thus, we are again left with a limited private search by Six Flags, the scope of which police exceeded in order to obtain evidence for criminal prosecution.

¶ 63 So the majority then flatly declares that defendant simply had no constitutionally cognizable expectation of privacy in the first place: "once he decided to submit the bag to X-ray screening, his expectation of privacy was thwarted, and he could not limit what type of search was conducted." *Supra* ¶ 26. This, of course, ignores the limited scope of defendant's consent, which was to a magnetometer screen and an X-ray, but the majority instead reframes the inquiry as

---

[5]Of course, such actions could nonetheless incur civil liability. *Francoeur*, 547 F.2d at 894.

whether defendant had the "power to limit what type of search Six Flags' security personnel conducted."[6] *Supra* ¶ 26. The majority concludes that defendant could not "limit" the search, reasoning that Six Flags *could have* conducted a more intrusive search, so any consequent search becomes justified, even if Six Flags did not conduct it themselves. The majority defends this logical leap by positing not only that defendant was subject to "the next logical step," whatever that might be, but also that this step would certainly have been a full physical search by police. *Supra* ¶ 23. Simply put, if defendant was in for a dime of consent, he was in for a dollar—even if Six Flags never demanded the full bill. This "logic" is inconsistent with fourth amendment jurisprudence.

¶ 64    As an initial matter, it is well established that consensual searches are indeed limited in scope by the terms of one's consent. *Jimeno*, 500 U.S. at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents."). The majority ignores cases explaining the scope of *consent* and goes back to cases discussing the scope of a private *search*, first citing *People v. Clendenin*, 238 Ill. 2d 302 (2010). But that case concerned a private actor, the defendant's girlfriend, who conducted a wide-ranging search of a computer disc belonging to the defendant, found a file containing child pornography, then turned the disc over to police, who viewed the video clip in question. *Id.* at 306. The court found that the girlfriend's "search was of sufficient scope to allow police to perform a general review of the files on the disc for the presence of child pornography." *Id.* at 327, 330. Specifically, the private actor's "seizure and viewing of the

---

[6]Worth noting here is the actual Six Flags' screening procedures policy, which states that "the Guest may terminate the search at any time even though they may have initially agreed to cooperate." Only once "something illegal" is found, according to Angelici's testimony, does a guest lose his ability to withdraw from screening.

disc were not state action implicating the fourth amendment," and the court held, "[t]here is no evidence to support defendant's contention that the scope of the investigation of the disc by [police] exceeded [the private actor]'s prior, private search; it merely confirmed the results of the private search." *Id.* at 331. While the majority here wants to use the "merely confirmed" quote, any fair reading of the case reveals that the court's holding was consistent with cases cited therein, that " 'learning with more precision what the video depicted' did not expand the police investigation beyond the scope of the [private actor]'s search." *Id.* at 329 (citing *People v. Phillips*, 215 Ill. 2d 554, 567 (2005) (computer repair technician played for police a video clip of child pornography found on the defendant's computer)). The *Clendenin* court specifically held that "the police search remained within the scope of the initial private search." *Id.* at 327. Thus, *Clendenin* and *Phillips* held that a private examination of computer disc files was not exceeded in scope when police subsequently viewed the same files.

¶ 65     The majority also cites *People v. Hill*, 2020 IL 124595, ¶ 29, simply for the quote that "[n]o one possesses a legitimate interest in contraband." This cherry-picked sentence, however, does not justify a warrantless search; instead, it explains why cannabis, despite being "decriminalized," remained illegal at the time and thus was still treated as contraband when found in an automobile. *Id.* The majority's citation to *Russell*, 2024 WY 126, is also inapposite. *Russell* involved a courthouse checkpoint search under the special law enforcement needs analysis involving diminished protections. *Id.* ¶ 17. It does not stand for the proposition that consent to search by a private actor cannot be limited.

¶ 66     The private search exception to the fourth amendment's warrant requirement is a "narrow doctrine with limited applications." *United States v. Wilson*, 13 F.4th 961, 968 (9th Cir. 2021). The extent to which the doctrine excuses governmental noncompliance with the warrant requirement

has an "unsettling" potential reach. *Id.* Under the doctrine, the police may "repeat the search" made previously by a private party without a warrant, "but only when the government search does not exceed the scope of the private one." *Id.*

¶ 67    In *Walter v. United States*, 447 U.S. 649, 651-52 (1980) (opinion of Stevens, J., joined by Stewart, J.), the private recipient of misdelivered obscene films notified the Federal Bureau of Investigation (FBI), which seized the films and viewed them. The boxes containing the films had "suggestive drawings" and "explicit descriptions of the contents." *Id.* The private recipient opened the boxes and attempted without success to view the film by holding it up to the light. *Id.* at 652. The Supreme Court held that the FBI exceeded the scope of the private actor by going beyond the physical bounds of the private search because "the private party had not actually viewed the films." *Id.* at 657. The court also found that the private search had only partially frustrated the defendant's expectation and did not "simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection." *Id.* at 659.

¶ 68    Of course, if the facts of this case were different, I would enthusiastically agree with the majority's scope of search conclusion: had the private security personnel actually opened and searched the bag by hand in the same way the Gurnee police did, there would be no question that the subsequent search by police would be permissible under the so-called "private search doctrine," which provides that "authorities typically may repeat a private search already conducted by a third party *but may not expand on it.*" (Emphasis added.) *United States v. Bebris*, 4 F.4th 551, 560 (7th Cir. 2021). But the private search was exceeded by the police search and defendant's expectation of privacy was only partially frustrated by the private search, not completely obliterated. Nonetheless, the majority takes the unprecedented step of applying the private search doctrine to a purely *hypothetical* private search, thus holding that law enforcement officers may

conduct any search that private actors *could have* conducted, whether they actually did so or not. This is a stretch, to say the least. Setting aside the fact that Six Flags' own policy explicitly prohibited its security personnel from removing firearms from "a bag or purse" they have screened, they did not, in fact, conduct a physical search inside the bag; *ipso facto*, no private physical search inside the bag could be lawfully duplicated by police.

¶ 69   The majority argues:

> "Angelici explained that '[t]he images on the x-ray machine will determine what the next step potentially would be.' If the images on the X-ray are inconclusive as to what the heavy metal object is, then the next logical step would have been for the security personnel to conduct a search of the bag by hand to determine what the heavy metal object was." *Supra* ¶ 23.

In other words, the majority holds that, by allowing the diaper bag to be screened by a magnetometer and X-ray scan, defendant implicitly consented to allow Six Flags security personnel to take the "next logical step," whatever that might be. According to the majority, that step (which defendant should have somehow anticipated) was for Six Flags security personnel to search the diaper bag by hand. This speculation not only contradicts Six Flags' written policy and Mr. Angelici's testimony on the matter but also assumes facts that did not occur. The "logical next step" was precisely the step that Six Flags security personnel actually took: to turn the bag over to police officers who were presumably better equipped to investigate.

¶ 70   In addition, the majority invokes the private search doctrine to uphold the search conducted by Gurnee police. As noted, that doctrine allows law enforcement officials to repeat a search conducted by a private actor but not expand on it. The private search here—a metal detector screening followed by an X-ray scan—revealed only the silhouettes of what appeared to be a

handgun, keys, and possibly coins. These items were only a small portion of the contents of the bag, most of which remained invisible to the X-ray scanner. The majority holds, however, that when the police rummaged through the bag, they did not exceed the scope of the search conducted by Six Flags security personnel and thus did not violate any subsisting expectation of privacy. Although the search by police was clearly more intrusive and expansive than the search by the private security personnel, the majority reaches this conclusion because the search by police did not reveal anything "material" that had not already been discovered in the private search. The majority evidently uses the word "material" to mean "incriminating."[7] Under the majority's theory, anything else in the bag—in constitutional terms, defendant's "papers[ ] and effects" (U.S. Const., amend. IV)—is fair game. Thus, in the majority's view, a search of the bag that revealed contraband or incriminating evidence other than the gun would have been unlawful; but because it revealed only personal items of no interest to law enforcement it was permissible. That understanding turns the fourth amendment on its head, making it an impediment to law enforcement while affording no protection to an individual's right to privacy in personal items of a possibly intimate nature that might be found in a closed, opaque bag.

¶ 71 The majority's analysis stems from an overly broad reading of a few words in *Clendenin*, 238 Ill. 2d at 329, in its discussion of an earlier decision, *Phillips*, 215 Ill. 2d 554. In *Phillips*, the defendant took his computer to a technician for repair. *Id.* at 559. After discovering a file that appeared to be child pornography the technician alerted the police, who, after viewing the video themselves, arrested the defendant. *Id.* The *Phillips* court held that, by viewing the precise same video that the technician did, the police merely duplicated the technician's private search; thus, the

---

[7]As explained below, this understanding may be incorrect.

search by police complied with the fourth amendment. The *Phillips* court rejected the defendant's argument that, because the technician had not given police a " 'particular[ized] description' " of what the video depicted, the search was unreasonable. *Id.* at 567-68. The *Phillips* court observed that "the police gained no new material information by viewing the video. They merely confirmed [the technician's] report that it appeared to be child pornography." *Id.* at 567.

¶ 72    The majority crafts the offhand observation that the police gained no new "material" information into a broad holding that no matter how much additional "nonmaterial" information the police discover, they do not exceed the scope of the private search. I disagree. To assess *Phillips*'s precedential effect, it is necessary to determine that case's *ratio decidendi. Kelley v. Sheriff's Merit Comm'n of Kane County*, 372 Ill. App. 3d 931, 934 (2007). Doing so entails ascertaining "(1) what facts were considered material by the court in the prior case, and (2) 'what proposition of law justified that decision on these material facts.' [Citation.]" *Panchinsin v. Enterprise Cos.*, 117 Ill. App. 3d 441, 444 (1983). The significant facts in *Phillips* were that even though the police examined the video more closely than the technician did, they saw nothing ("material" or otherwise) that the technician had not already seen. The principle of law applicable to the actual facts of the case was that "learning with more precision what the video depicted did not take them beyond the scope of [the technician's] search." *Phillips*, 215 Ill. 2d at 567 (citing *United States v. Simpson*, 904 F.2d 607, 610 (11th Cir. 1990) (search by government agents "did not exceed the scope of the prior private searches *** simply because they took more time and were more thorough")).

¶ 73    As noted, the majority apparently interprets the word "material," as used in *Phillips*, to refer to contraband or incriminating evidence. However, the *Phillips* court never defined or offered any example to illustrate the meaning of "material." Other courts that have used similar language

to delimit the scope of a private search have been clearer on this point. For instance, in *United States v. Lowers*, 715 F. Supp 3d 741, 752 (E.D.N.C. 2024) (quoting *United States v. Jacobsen*, 466 U.S. 109, 119 (1984)), the court explained that "a government search does not exceed a private search when there is a 'virtual certainty' that the government search would reveal 'nothing ... *of significance*' that the private search did not already reveal." (Emphasis added.) "Something of significance, in that context, refers to a noncontraband personal effect in which an individual could have a reasonable expectation of privacy." *Id.* at 757. I would interpret "material" to mean the same thing as "significant." That interpretation better conforms to the values underlying the fourth amendment than the majority's interpretation does.

¶ 74    Thus, the correct rule, as other courts have recognized, is that "[w]hen the government views *anything other than the specific materials that a private party saw during the course of a private search*, the government search exceeds the scope of the private search." (Emphasis added.) *Wilson*, 13 F.4th at 974. This rule was applied in *United States v. Crist*, 627 F. Supp. 2d 575, 587 (M.D. Pa. 2008) which, like *Phillips*, stemmed from a private citizen's discovery of child pornography (a few video files) on the defendant's computer. Unlike in *Phillips* however, law enforcement officials did not limit their examination of the computer to the files discovered as a result of the private search. Instead, without a warrant, they conducted a full-scale forensic analysis of the computer's hard drive. Not surprisingly, this difference led to a different outcome than in *Phillips*. The *Crist* court held that the defendant's privacy interest was lost only with respect to the few videos discovered as a result of the private search. As the *Crist* court explained, "[t]he Government's warrantless search of [the] computer exceeded the scope of the private search because the Government was not substantially certain the computer contained *only* contraband."

(Emphasis added.) *Id.* at 587. Likewise, here defendant retained his expectation of privacy in the items not revealed by the X-ray scan.

¶ 75      According to the majority, "[because] the screening revealed contraband—the gun which defendant admitted he was not allowed to possess—that also eliminated any privacy interest he had in the continued *possession* of the firearm." (Emphasis added.) *Supra* ¶ 26. This is a proper justification for seizure of the bag; it is not a justification for opening it without a warrant or warrant exception. As noted, "a defendant can have a legitimate expectation of privacy with respect to contraband placed in a closed, opaque container to conceal it." *Ramires*, 152 S.W.3d at 400. Just because police found contraband does not retroactively justify the means by which they obtained it.

¶ 76      Finally, the majority holds that this case falls under the "foregone conclusion" line of cases. Citing *People v. Jones*, 215 Ill. 2d 261, 279 (2005), the majority contends that because it was a "foregone conclusion" that the diaper bag contained contraband—an unlawfully possessed handgun—no warrant was required to search the bag. *Jones* held that a "one-hitter" box—an item characteristically used to store cannabis—was subject to a warrantless search. As discussed by the majority, the *Jones* court reasoned that, "[c]ourts have held that when a container is 'not closed,' or 'transparent,' or when its 'distinctive configuration proclaims its contents,' the container supports no reasonable expectation of privacy and the contents thereof can be said to be in plain view." *Id.* Here the diaper bag fits in none of these categories, but the *Jones* court also more broadly observed that "[w]here law enforcement officers already possess knowledge as to the contents of the container, the search of the container does not unreasonably infringe upon the individual interest in preserving the privacy of *those* contents." (Emphasis added.) *Id.* "Those contents" clearly refers to the contents already known to the law enforcement officers. That reasoning does

not extend to a search like the one in this case, where law enforcement officers have knowledge of only a *portion* of the contents.

¶ 77    Also worth noting is the State's failure to present evidence that the police actually viewed the X-ray or the image taken by the security guard. Testimony at the hearing was that the image was not shown to the police, but that they merely heard from the security supervisor that he had observed the X-ray image. No testimony was taken concerning anyone's experience or training in identifying objects depicted in the image as contraband. This is an important consideration because determining whether the scope of a police search of a closed container exceeded a private search requires that "the police are already substantially certain of what is inside the container based on the statements of the private searchers, their replication of the private search, and their expertise." *United States v. Runyan*, 275 F.3d 449, 463 (5th Cir. 2001). While the hearsay statement of Angelici may arguably qualify as a statement by the searcher even though he did not do the search himself, the police action of opening the bag did not replicate the X-ray search, and as stated, no testimony was elicited as to the officer's expertise, experience or training.

¶ 78    Whereas the majority sees this case as a "textbook example" of a warrantless search of a container that is permissible based on knowledge of its contents, a prominent fourth amendment scholar, Professor Wayne R. LaFave, has suggested a strikingly similar scenario in which the authority to search is questionable at best. Touching upon the question of whether a warrantless search of a container is permissible after a defendant makes incriminating admissions about the container's contents, Professor LaFave suggested that such admissions are analogous to exposing the contraband to plain view by storing it in a transparent container. 3 Wayne R. LaFave, Search and Seizure § 5.5(f), at 377 (6th ed. 2020). While that suggestion is consistent with the majority's analysis, Professor LaFave added a significant qualification:

"[t]his analogy is most compelling when *the statement is as to the entire contents of the container.* If a person tells the police he has a stolen diamond ring in his suitcase, it might be argued that this is not a surrender of his privacy expectation regarding the contents of the case generally." (Emphasis added.) *Id.* § 5.5(f) at 377 n.242.

Although Professor LaFave did not express any definitive opinion on the validity of such an argument, I am reluctant to extend the reasoning of *Jones* to cases where the contents of a container are only partly known.

¶ 79     In its characterization of the evidence at the hearing concerning what it deems the "foregone conclusion" that there was a gun in the bag (*supra* ¶ 31), the majority relies heavily on a single statement by Officer Rock on redirect examination: "Q. And as soon as you got there the defendant was saying that he had a gun in his bag; correct? A. Correct." On this single statement, the majority concludes that "defendant had acknowledged that the gun was his." *Supra* ¶ 27. The majority then adds its own versions of the statement, saying "defendant acknowledged that there was a gun in the bag" (*supra* ¶ 23), "defendant himself had acknowledged in [the officers'] presence that there was a gun in the bag" (*supra* ¶ 31), and "defendant had said as much" (*supra* ¶ 32).

¶ 80     However, some of the testimony and the majority's characterization of the evidence are contradicted by the video evidence presented at the hearing. At the 1:25 mark of the video, as Officer Rock approaches the front gate, Angelici can be heard asking defendant, "do you have concealed carry?," to which defendant responded, "no." That is it. At no point in the video could defendant be heard stating to Officer Rock that "he had a gun in his bag" or any words to that effect, nor can defendant be heard making any affirmative statement or admission to either owning

- 35 -

or possessing the firearm in question. In fact, defendant repeatedly denies knowing the gun was there or that it was his.

¶ 81    Moreover, it is clear from the video that, at the beginning of the encounter, the officers are unaware of who they should consider as possessor of the bag. At the 1:39 mark, Officer Butur is heard asking defendant's wife, "what's going on, whose is it?," to which she responds, "it was in my trunk." Angelici adds, to Butur at 2:03, "when it came through, he walked to me, because I grabbed it, but I don't know who brought it."[8] Obviously, this is inconsistent with Officer Rock's testimony that "I was instructed by Officer Butur" that Angelici had told Butur that defendant was the one pushing the stroller.

¶ 82    At the 2:09 mark, Angelici hands the bag to Officer Butur. At 3:30, defendant tells Officers Butur and Szalkowski that his wife has a CCL, which she affirms, stating to an officer identified only as "A.J." at 5:20, "I don't remember that—we didn't remember that it was [inaudible], I just grabbed it out the trunk and that was it." Defendant then, at 5:40, says, "give my baby her s*** back, we gon' go, we gon' take that b*** outside, that'll be all we do." At 6:15, defendant becomes upset that one of the officers is putting on rubber gloves. At 7:40, Officer A.J. seeks to calm defendant by saying, "we're here because you forgot to take the gun out of there." Defendant responds, "I ain't forget," to which Officer A.J. replies, "Well, somebody did." Defendant then says, at 8:28, "I ain't did s*** wrong." Officer A.J. then says, "sir, you can't bring a gun—," which

_____

[8]The majority characterizes Angelici's testimony as "When the officers arrived, Angelici told them that the bag was defendant's ***." *Supra* ¶ 6. But Angelini's testimony at the hearing was, "And there was another question I asked as to whose gun it was and I didn't get an indication or answer on that, just that he wanted to bring the gun back to the vehicle."

defendant interrupts, saying "I didn't know it was there, I had no knowledge." Defendant's wife then says, "It was my fault [inaudible], it has nothing to do with him."

¶ 83    As the foregoing makes clear, the facts underpinning the majority's holding are in dispute, and we owe deference to the trial court's determinations. Nonetheless, the majority finds that the facts so clearly support its "foregone conclusion" argument that they deem the trial court's determination to be contrary to the manifest weight of the evidence. The majority's holding is unwarranted.

¶ 84    The police here had ample time to seek a search warrant, and there were no exigent circumstances or any other exception to the warrant requirement. They should simply have sought to have a neutral magistrate determine probable cause and authorize them to open the bag. Because defendant did not consent to the physical search of the diaper bag by either private security or Gurnee police, the police search exceeded the scope of the private search, and the Gurnee police had no reason to believe that the *entire* contents of the bag were contraband or that the container confirmed contraband inside, I would affirm the trial court's order granting defendant's motion to suppress.

*People v. Long*, **2025 IL App (2d) 240237**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 23-CF-1186; the Hon. Patricia S. Fix, Judge, presiding. |
| **Attorneys for Appellant:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and David S. Friedland, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | Jason S. Dreifuss, of Waukegan, for appellee. |